CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
September 30, 2024
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| MARTHA KAY BAIRD HOOKER, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 7:23-cv-00750 |
| CHERYL FACCIANI, et al., | ) By: Elizabeth K. Dillon |
| Defendants. | ) Chief United States District Judge |

**MEMORANDUM OPINION**

Plaintiff Martha Kay Baird Hooker brings this action against defendants Cheryl Facciani, Timothy Greenway, Brent Hudson, and Dr. Ken Nicely in relation to her termination from the Roanoke County Public Schools ("RCPS") as a Work Based Learning Coordinator in May 2023. (*See* Am. Compl., Dkt. No. 19.) Hooker was told she was being terminated because her elected service on the Roanoke Board of Supervisors ("BOS"), which began in 2016 after she was elected in 2015, created a conflict of interest. She alleges that she was terminated because of her vote on a BOS issue, with which some RCPS Board Members disagreed.

Pending before the court is the defendants' motion to dismiss her claims on various grounds. (Dkt. No. 20.) For the following reasons, the defendants' motion to dismiss will be granted in part and denied in part.

I. BACKGROUND

Hooker worked as a teacher for Roanoke County Public Schools ("RCPS") for nineteen years before retiring from that role in May 2021. (Am. Compl. ¶ 1.) Shortly thereafter, she was approached by the director of Career and Technical Education ("CTE") with an opportunity to continue working for RCPS. (Am. Compl. ¶ 10.) She was then hired on as the Work Based

Learning Coordinator. (*Id.*) Hooker received positive performance reviews throughout her time in that role, and in March 2023, she accepted an extension to her initial job contract with RCPS, which would have continued her employment through the 2023–2024 school year. (*Id.* ¶¶ 11–15.)

In November 2015, during her time as a teacher, Hooker was elected by voters in the Catawba District to serve on the Roanoke Board of Supervisors ("BOS"). (*Id.* ¶ 3.) The BOS is the "policy-determining body" of Roanoke County and the elected members have a "statutory right and duty to vote on ordinances and resolutions" before the BOS. (*Id.* ¶¶ 16–17.) Hooker began her term in January 2016 and, at the time of the amended complaint, served as Chairwoman of the BOS. (*Id.* ¶ 3.) "Out of an abundance of caution," Hooker requested and received legal opinions from the Roanoke County Attorney's Office to ensure that no conflicts of interest existed due to her employment with RCPS. (*Id.* ¶¶ 20–22.) At no time during Hooker's employment with RCPS, prior to her termination in 2023, were any concerns expressed or noted regarding any appearance of impropriety or conflict of interest with respect to her position on the BOS and her employment with RCPS. (*Id.* ¶¶ 23–24.)

As the governing body of Roanoke County, the BOS makes appropriations to RCPS and can do so in either "one lump sum," or in "such major classifications prescribed by the Board of Education."[1] (*Id.* ¶¶ 25–26.) In the Fall of 2022, when discussing RCPS appropriations for the 2023–2024 year, the BOS voted unanimously to appropriate funds by "major classifications," which was a departure from the "one lump sum" appropriation method used in prior years. (*Id.*

---

[1] The "major classifications" established by the Board of Education include: (i) instruction, (ii) administration, attendance, and health, (iii) pupil transportation, (iv) operation and maintenance, (v) school food services and other noninstructional operations, (vi) facilities, (vii) debt and fund transfers, (viii) technology, and (ix) contingency reserves. (Am. Compl. ¶ 27.)

¶¶ 28–30.)  Hooker alleges that her vote "was an expression of her own first amendment rights" and "her statutory right and duty as a member of the BOS."  (*Id.* ¶ 32.)

Defendants Facciani, Greenway, and Hudson ("the School Board Defendants") are Board Members of RCPS.  Hooker alleges that they were displeased with the BOS's decision to appropriate RCPS funds by "major classification" rather than "one lump sum" and openly expressed their dissatisfaction in public statements, directing their anger toward Hooker because she was an RCPS employee.  (*Id.* ¶ 35.)  In Spring 2023, Hudson telephoned Hooker to complain about her "unacceptable" vote and did so in a "derogatory tone and hostile demeanor."  (*Id.* ¶¶ 36–37.)  Hooker further alleges, that when she announced in January 2023 that she was going to run for reelection to the BOS, the School Board Defendants tried to undermine her efforts— namely by endorsing and posing for photos with her challenger.  (*Id.* ¶¶ 40–43.)  Hooker acknowledges that the School Board Defendants were free to support the candidate of their choice.  (*Id.*)  However, she notes that they made a "political statement" against her when they chose to skip a joint signing ceremony between BOS and RCPS in April 2023, celebrating a historic $130 million funding for RCPS building and renovation projects.  (*Id.*)  When it became clear that Hooker was going to retain her seat on the BOS, she alleges that the School Board Defendants started their efforts to terminate her employment as the Work Based Learning Coordinator for RCPS.  (*Id.* ¶ 44.)

The School Board Defendants advised the Superintendent of RCPS, defendant Nicely, that Hooker's continued employment with RCPS presented a conflict of interest and recommended that she be terminated.  (*Id.* ¶ 45.)  As Superintendent, Nicely is the highest-ranking employee of RCPS and has primary responsibility for hiring and firing decisions.  (*Id.* ¶ 46.)  The RCPS School Board is responsible for appointing the superintendent and assessing

his performance on a continuing basis, but its role in other personnel matters within RCPS is advisory.  (*Id.* ¶¶ 47–48.)  Hooker acknowledges this advisory role, citing to the RCPS School Board Bylaws, Article I: "The Board, both individually and collectively, will promptly advise the superintendent of all significant criticisms, complaints, and suggestions concerning the Roanoke County Public Schools or its employees for study, review[,] and recommendation." [2]  (*Id.* ¶ 48.)  However, Hooker contends that the School Board Defendants violated the bylaws when they communicated separately to Nicely, outside of an official RCPS School Board meeting and without consulting the full RCPS School Board, about their desire for Hooker's employment to be terminated.  (*Id.* ¶¶ 49–52.)  Nonetheless, Nicely tasked Hooker's supervisor with terminating Hooker.  (*Id.* ¶ 53.)

On May 30, 2023, Hooker's supervisor informed her that the "RCPS School Board had made the decision to terminate her employment effective immediately, even though [she] 'had done a good job.'"  (*Id.* ¶ 54.)  Hooker alleges that right after her termination, she telephoned another member of the RCPS School Board, not a party to this lawsuit, to inquire about her termination, but that board member was unaware of the decision.  That board member then called up another board member, not a party to this lawsuit, who also had no knowledge of the termination decision.  (*Id.* ¶¶ 55–56.)  Hooker met with Nicely later that afternoon, who indicated to her that although her performance was good, she was terminated due to a "conflict of interest" and that he believed the School Board did not want her working for RCPS and being a member of the BOS at the same time.  (*Id.* ¶¶ 56–59.)  Hooker notes that by 2023, she had simultaneously been working for RCPS and serving as a member of BOS for seven years.  (*Id.*

---

[2] It appears this provision does not address terminations and, if it did, may conflict with Virginia Code § 22.1-313 which states, "The school board shall retain its exclusive final authority over matters concerning employment and supervision of its personnel, including dismissals and suspensions."

4

¶ 60.) In her meeting with Nicely, he emphasized that the decision to terminate her was made by the majority of the RCPS School Board and not himself, noting that "[he] was not willing to die on that hill." (*Id.* ¶ 61.) When questioned about the School Board's involvement in personnel decisions, Nicely responded, "Sometimes the School Board gets out of their lane." (*Id.*)

Hooker alleges that the decision to terminate her came not from the RCPS School Board as a whole, but the three School Board Defendants acting out of retaliation for her vote on the BOS to appropriate funds by major classification instead of in one lump sum. Furthermore, she contends that Nicely "acquiesced to the demand" of her termination, knowing of the directive's unauthorized nature. (*Id.* ¶¶ 62–66.) Hooker brings two claims against the defendants in their individual and official capacities: (1) a First Amendment retaliation claim under 42 U.S.C § 1983, and (2) a wrongful termination claim under Virginia common law, also known as a *Bowman* claim.[3]

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557). The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

---

[3] *Bowman v. State Bank of Keysville,* 331 S.E.2d 797 (Va. 1985), created a limited exception to Virginia's at-will employment doctrine, allowing a cause of action if a termination violates public policy.

In determining whether the plaintiff has met this plausibility standard, the court must accept as true all well-pleaded facts in the complaint and any documents incorporated into or attached to it. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but it "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments,'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

## III.  DISCUSSION

In their motion to dismiss, defendants argue that Hooker's official-capacity claims must be dismissed because she has failed to allege that any policy or custom of the RCPS School Board resulted in her termination. (Mem. Supp. Mot. Dismiss 4–5, Dkt. No. 21.) In addition, the defendants argue that Hooker's 42 U.S.C. § 1983 First Amendment retaliation claim fails for three different reasons: (1) Hooker has failed to sufficiently allege a retaliation claim, (2) the defendants are entitled to qualified immunity, and (3) the School Board Defendants did not take any action against Hooker. (*Id.* at 5–10.) The defendants also contend that Hooker's *Bowman* claim fails because the statute Hooker relies on to bring the claim does not confer any rights on her and the termination does not violate public policy. (*Id.* at 10–14.) The court will grant the defendants' motion to dismiss as to all official-capacity claims and the *Bowman* claim. The court will deny the defendants' motion to dismiss as to Hooker's 42 U.S.C. § 1983 First Amendment retaliation claim. The analysis behind the court's ruling on each claim is discussed in turn.

A. **Official-Capacity Claims**

Hooker's amended complaint names the defendants in both their individual and official capacities. (*See* Am. Compl. at 1.) The Supreme Court of the United States distinguished individual-capacity suits from official-capacity suits in *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Whereas "[p]ersonal-capacity suits seek to impose personal liability upon a governmental official for actions he takes under color of state law," *id.*, "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). An official-capacity suit is "treated as a suit against the entity" and as such, that entity "must be a moving force behind the deprivation." *King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016) (quoting *Graham*, 473 U.S. at 166). "[T]hus, the entity's policy or custom must have played a part in the violation of federal law." *Graham*, 473 U.S. at 166 (internal quotation marks and citations omitted). In order to "get past the pleading stage, a complaint's description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it must contain specific facts." *Allen v. Good*, No. 7:22-CV-00351, 2023 WL 5984287, at *6 (W.D. Va. Sept. 14, 2023) (quoting *Henderson v. Harris Cnty.*, 51 F.4th 125, 130 (5th Cir. 2022)).

As an initial matter, it appears Hooker does not dispute that the allegations in the amended complaint are insufficient regarding the official capacity claims because Hooker does not address the defendants' argument in her response. *See, e.g.*, *Roman v. Spilman Thomas & Battle, PLLC*, No. 7:23-cv-00749, 2024 WL 2330041, at *3 (W.D. Va. May 22, 2024) (holding that where a party fails to respond to an argument it concedes that argument); *Gowen v. Winfield*, No. 7:20-cv-00247, 2022 WL 822172, at *4 (W.D. Va. Mar. 18, 2022). Regardless, Hooker's amended complaint fails to allege that any policy or custom of the RCPS School Board was the

moving force behind her alleged wrongful termination, so the court concludes that Hooker fails to state a claim upon which relief may be granted with respect to the official-capacity claims against the defendants. But, because Hooker may be able to state such a claim with additional allegations about official custom or policy (*Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978)) or about decisions of a final policy-maker, whether it be Superintendent Nicely or the School Board Defendants (*St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)), the court will grant the defendants' motion to dismiss the official-capacity claims without prejudice.

**B.  42 U.S.C. § 1983 First Amendment Retaliation Claim**

    **1.  Hooker sufficiently alleged facts to state a First Amendment retaliation claim.**

In order for a public employee to state a First Amendment retaliation claim under 42 U.S.C. § 1983, "a plaintiff must show (1) [she] spoke as a citizen on a matter of public concern, rather than as an employee on a matter of personal interest; (2) the employee's 'interest in [her] expression outweighed the employer's interest in providing effective and efficient services to the public; and (3) the employee's speech was a 'substantial factor' in the adverse employment action." *Massaro v. Fairfax Cnty.*, 95 F.4th 895, 905 (4th Cir. 2024) (citing *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998) (the "*McVey* test")). The defendants do not contest that Hooker has adequately alleged the first and third prongs of the *McVey* test but do take issue with the second prong. Specifically, they argue that Hooker has failed to sufficiently allege any facts to support the position that Hooker's interests in her speech outweighed the defendants' interests in the efficient and effective operation of RCPS. (Mem. Supp. Mot. Dismiss 4–8.)

"Under the *McVey* test's second prong, commonly referred to as the '*Pickering* balancing,' [the court] must assess whether the Amended Complaint has sufficiently alleged that [the plaintiff's] interest in First Amendment expression outweighed the [defendant's] interest in

the efficient provision of public services." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 317 (4th Cir. 2006) (citing *McVey*, 157 F.3d at 277). *Pickering* balancing requires the court to "'take into account the context of the employee's speech' and 'the extent to which it disrupts the operation and mission' of the institution." *Id.* (quoting *McVey*, 157 F.3d at 278). This balancing requires the court to consider:

> whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

*Id.*

Hooker contends that her BOS vote to appropriate RCPS funding "did not impact any job duty, project, assignment, or goal related to her employment." (*Id.* ¶ 33.) Furthermore, she alleges that her vote "did not impair discipline by her supervisors, cause disharmony among co-workers, or have a detrimental impact on close working relationships." (*Id.* at ¶ 71.) In addition, Hooker argues that her vote "did not impede or conflict with the performance of her duties" and "had absolutely no effect on the mission, administration, or performance of RCPS." (*Id.* ¶¶ 72, 74.)

Defendants argue that these allegations are conclusory and that the facts alleged in the amended complaint demonstrate the opposite. (Mem. Supp. Mot. Dismiss 7.) Specifically, they point to Hooker's factual allegation that her vote to "appropriate RCPS funding in accounting categories" led to "dissatisfaction [by School Board members] with the BOS," because the School Board Defendants wanted the BOS to "appropriate RCPS funding in a lump sum." (Am.

9

Comp. ¶¶ 33, 35, 37.)  From that, the defendants ask the court to infer that "Hooker's vote was in direct conflict with RCPS's funding goals for the school division as well as the CTE department," and as such, "impaired discipline by her supervisor[], . . . impaired harmony among co-workers whose jobs could be negatively impacted by funding restrictions[,] . . . impeded the performance of her duties[], and interfered with the operation of the CTE department (if not the entire school system)."  (Mem. Supp. Mot. Dismiss 7–8.)  Such an inference is not reasonable.

In analyzing the defendants' motion to dismiss, the court finds particularly instructive the Fourth Circuit's holding in *Ridpath,* 447 F.3d at 318.  There, in a case concerning a similar First Amendment retaliation claim, the court found that the plaintiff, Ridpath, had sufficiently shown his interest in speaking outweighed a school's interest in promoting the efficient provision of public services.  *Id.*  In reaching its decision, the court noted that "[n]othing in the Amended Complaint indicates . . . that his comments impaired the maintenance of discipline, hurt workplace morale, or constituted an abuse of his position."  *Id.*  Furthermore, the defendants had not suggested that Ridpath's speech interfered with the school's efficient operation.

> Once a factual record is developed through discovery, the evidence could support the inference that Ridpath's workplace was impaired as a result of his comments and that he simply had to be terminated from his adjunct teaching position. Such a question, however, is not to be assessed under Rule 12(b)(6) but in Rule 56 summary judgment proceedings. *See McVey*, 157 F.3d at 278–79 (affirming district court's decision to defer deciding qualified immunity until "record is better developed" in part because complaint did not "resolve on its face" second prong of *McVey* test). At the Rule 12(b)(6) stage, Ridpath's allegations warrant the inference that his free speech interests outweigh the detrimental effect, if any, his comments may have had on the efficiency of his workplace.

*Id.*  Accepting the well-pleaded allegations of Ridpath's amended complaint as true and giving him "the benefit of the reasonable factual inferences," the court could not say "that 'it appears

beyond all doubt that [Ridpath] can prove no set of facts' to tip the *Pickering* balance in his favor." *Id.* (quoting *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001)).

The same is true here. Accepting all well-pleaded allegations in Hooker's amended complaint as true and drawing all factual inferences in Hooker's favor, the court finds that her allegations plausibly state that her free speech interests outweigh any potential detrimental effect that her vote may have had on the efficiency of RCPS operations. Read in the proper light, the amended complaint alleges that Hooker was terminated for exercising her protected right to free speech—her vote as a BOS member. While defendants have suggested that Hooker's speech interfered with RCPS's efficient operations, they do so in rather conclusory fashion themselves, arguing that "the facts alleged by Hooker [] lead to an inference that her speech must necessarily impair the maintenance of discipline, hurt workplace morale, imped[e] the performance of her duties, and interfer[e] with the operation of her department." (Reply Mem. Supp. Mot. Dismiss 3, Dkt. No. 24.) However, the court must "draw[] all reasonable factual inferences . . . in the *plaintiff's* favor." *Edwards,* 178 F.3d at 244 (emphasis added). Moreover, given that the Virginia General Assembly, by statute, allows only two methods of funding allocation to school boards (Virginia Code § 22.1-94) and the BOS decided by unanimous vote to use one of those two methods, it is not reasonable to infer that one of those mandated methods negatively affects a school board's interest in the efficient provision of public services. As such, accepting as true all well-pleaded facts in the amended complaint and drawing all reasonable factual inferences in Hooker's favor, the court finds that Hooker has sufficiently stated a First Amendment retaliation claim under 42 U.S.C. § 1983.

**2. Defendants are not entitled to qualified immunity.**

It is well established that "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024) (internal citation omitted); *see also Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) ("To determine whether a complaint should survive a qualified immunity-based motion to dismiss, [courts] exercise 'sound discretion' in following the two-prong inquiry set forth by the Supreme Court, analyzing (1) whether a constitutional violation occurred and (2) whether the right violated was clearly established.") (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "For a right to be clearly established, there need not be 'a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Cannon v. Vill. of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Put differently, a constitutional right is clearly established when its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal citations omitted) (quotations omitted).

The first prong of the qualified immunity analysis in this case requires the court to determine if Hooker has sufficiently alleged a violation of a First Amendment right. For the reasons already discussed *supra* Section III.B.1., the court finds that Hooker has sufficiently alleged a First Amendment retaliation claim. The court now moves to the second prong on the qualified immunity analysis and must determine whether Hooker's alleged right violated was clearly established.

The Fourth Circuit has acknowledged that "because of the 'sophisticated balancing' involved in First Amendment questions, 'only infrequently will it be clearly established that a

public employee's speech on a matter of public concern is constitutionally protected.'" *Cannon*, 891 F.3d at 499 (citing *Ridpath*, 447 F.3d at 320) (quoting *McVey*, 157 F.3d at 277). However, the Fourth Circuit has found a discharged employee's interest in free speech was clearly established at the time of his or her termination on multiple occasions. *See Ridpath*, 447 F.3d at 320–21; *Cromer v. Brown*, 88 F.3d 1315, 1327 (4th Cir. 1996) (holding that a police officer's interest in raising concerns about discrimination within a police department were greater than the department's interest of "discipline, morale and good working relationships"). Furthermore, in *McVey*, the Fourth Circuit affirmed a district court's decision rejecting a defendant's qualified immunity claim on his motion to dismiss because the "record had not been developed" on whether the plaintiff's First Amendment interests were outweighed by the defendant's interest in effective and efficient management. *McVey*, 157 F.3d at 279. Like *McVey* and *Ridpath*, this court is analyzing a qualified immunity defense at the Rule 12(b)(6) stage. And similar to both cases, this court will reject the defendants' qualified immunity defense on Hooker's 42 U.S.C. § 1983 claim at this stage in the proceedings.

In rejecting the defendants' qualified immunity defense on a motion to dismiss, the district court in *McVey* observed that "the record before the court, at this early stage in litigation, is sparse as to what the relative interests of the parties are." *McVey*, 157 F.3d at 175. It further noted that "when there are factual issues intermingled with the legal question, the court may find it necessary to wait for those factual issues to be explored in discovery or in some cases may even require trial by a jury or by the district court." *Id.* (internal citation omitted). The Fourth Circuit affirmed that decision and concluded "that the question whether McVey's interest in [] speech was outweighed by the agency's interests in effective and efficient management [was] still open for determination." *Id.* at 279. The court indicated that "the concomitant

13

determination necessary for resolving the defendants' immunity claim" was which party's interest outweighed the other's. *Id.* The court left those factual issues to be explored further during discovery.

Unlike *McVey*, this court has already determined that Hooker has sufficiently alleged that her interests outweigh the defendants', which is all the more reason to deny the defendants' qualified immunity defense at this time. (*See* discussion *supra* Section III.B.1.) Furthermore, it is well established that the "First Amendment protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern." *McVey*, 157 F.3d at 277. As noted above, "a constitutional right is clearly established when its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Cannon*, 891 F.3d at 489 (internal citations omitted) (quotations omitted). Here, Hooker has alleged that the defendants acted outside of the RCPS School Board Bylaws, bypassing the advice and perspective of two other RCPS School Board members, to communicate their desire to terminate Hooker's employment, which ultimately lead to their desired outcome. (Am. Compl. ¶¶ 44–67.) In addition, the amended complaint alleges that "the decision to terminate Ms. Hooker was made by a majority of the RCPS School Board and not [Superintendent Nicely]." (*Id.* ¶ 61.) Accepting all well-pleaded factual allegations in Hooker's amended complaint a true, a reasonable official would understand that bypassing the established procedures and bylaws to have an employee terminated because he or she disagreed with her vote as a member of the BOS on a matter of public concern would be a violation of Hooker's First Amendment rights. As such, Hooker has satisfied the second prong to survive a qualified

immunity-based motion to dismiss. At this stage in the court proceedings, the defendants are not entitled to qualified immunity on Hooker's 42 U.S.C. § 1983 claim.[4]

### 3. Hooker has sufficiently alleged the School Board Defendants took action against her.

"To state a claim under § 1983[,] a plaintiff 'must allege the violation of a right secured by the Constitution and laws of the United States[] and must show that the alleged deprivation was committed by a person acting under color of state law.'" *Loftus v. Bobzien*, 848 F.3d 278, 285 (4th Cir. 2017) (quoting *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011)). As such, "liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights." *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (internal citation omitted) (quotations omitted).

The School Board Defendants contend that Hooker's § 1983 claim must be dismissed because her amended complaint "is devoid of any allegation that [they] took any action to effectuate her alleged termination." (Mem. Supp. Mot. Dismiss 10.) However, Hooker's amended complaint contains numerous factual allegations that point to the contrary. It alleges that "the School Board Defendants determined to use the advantage of their position as Ms. Hooker's employer to retaliate unlawfully against Ms. Hooker for her BOS vote." (Am. Compl. ¶ 44.) The amended complaint further alleges that the School Board Defendants used their authority over Superintendent Nicely to lobby for her termination. (*Id.* ¶¶ 45–48.) In doing so, they bypassed the established procedures and bylaws of the RCPS School Board, making no attempt to consult the two additional RCPS School Board members. (*Id.* ¶¶ 49–52.) Hooker contends that these communications led to the decision to terminate her from her employment.

---

[4] The court notes that the defendants are not precluded from reasserting their qualified immunity defense at a later stage in the court proceedings.

15

As noted before, the amended complaint alleges that "the decision to terminate Ms. Hooker was made by a majority of the RCPS School Board and not [Superintendent Nicely]." (*Id.* ¶ 61.) Defendants seem to have glossed over these pertinent factual allegations when making their argument. Taking into account all of the factual allegations in Hooker's amended complaint, the court finds that she has sufficiently alleged facts that show the School Board Defendants acted personally in the deprivation of Hooker's First Amendment rights. As such, the court will deny the defendants' motion to dismiss the 42 U.S.C. § 1983 First Amendment retaliation claim on this ground.

### C. Virginia Common Law Wrongful Termination Claim Under *Bowman*

"Virginia courts have recognized only three categories in which an employee may demonstrate that [their] termination violates public policy under *Bowman*: (1) where an employer violates 'a policy enabling the exercise of an employee's statutorily created right,' (2) 'when the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy', and (3) 'where the discharge was based on the employee's refusal to engage in a criminal act.'" *Hulkenberg v. Anabaptist Healthshare*, 855 F. App'x. 871, 873 (4th Cir. 2021) (citing *Rowan v. Tractor Supply Co.*, 559 S.E.2d 709, 711 (Va. 2002)).

Count II of Hooker's amended complaint alleges a *Bowman* claim under the first category—"[t]he Defendants' retaliatory termination of Hooker's employment was a wrongful discharge, violating a policy enabling the exercise of Hooker's statutorily created right to cast a vote as a member of the BOS." (Am. Compl. ¶ 84.) The Virginia Supreme Court has indicated "in order to successfully state a claim for wrongful discharge under *Bowman* Scenario 1, it must be shown that the employer's termination violated public policy." *Francis v. Nat'l Accrediting*

*Comm'n of Career Arts & Scis., Inc.*, 796 S.E.2d 188, 191 (Va. 2017) (citation omitted). When a court analyzes such a claim, "it is important to discern what right was conferred on an employee by statute, and then whether the employer's termination of employment violated the public policy underlying that right." *Id.*

Hooker contends that "[her] seat on the BOS provides her a statutory right to cast a vote on matters before the board, particularly appropriations." (Am. Compl. ¶ 82.) Hooker derives that right from Virginia Code § 15.2-1428, which reads:

> No ordinance or resolution appropriating money exceeding the sum of $500, imposing taxes, or authorizing the borrowing of money shall be passed except by a recorded affirmative vote of a majority of all members elected to the governing body. In case of the veto of such an ordinance or resolution, where the power of veto exists, it shall require for passage thereafter a recorded affirmative vote of two-thirds of all members elected to the governing body.

Hooker tries to equate this Virginia statute with the one in *Bowman*. However, the statute in *Bowman* explicitly conferred a right to vote on the plaintiffs: "[U]nless the articles of incorporation provide otherwise, each outstanding share, regardless of class or series, is *entitled* to one vote on each matter voted on at a shareholders' meeting. Only shares are entitled to vote." Va. Code § 13.1-662 (previously codified under Va. Code § 13.21-3.2) (emphasis added). Hooker is asking the court to analogize Virginia Code § 15.2-1428 with Virginia Code § 13.1-662 and confer a statutory "right for a member of a local governing body to cast a vote on appropriations measures." (Mem. Opp'n. Mot. Dismiss 9, Dkt. No. 23.) However, a plain reading of the statute cited by Hooker indicates no such right being conferred. Rather, it serves as a procedural law outlining how certain monetary appropriations are to be determined by the members elected to the governing body.

The court is not in a position to create rights from Virginia statutes—that is the job of the Virginia General Assembly. The Virginia Supreme Court has "consistently characterized"

17

*Bowman* claims as "narrow," and has noted "while virtually every statute expresses a public policy of some sort, we continue . . . to hold that termination of an employee in violation of the policy underlying any one statute does not automatically give rise to a common law cause of action for wrongful discharge." *Francis*, 796 S.E.2d at 190. (internal citations omitted) (quotations omitted). The statute under which Hooker brings her *Bowman* claim does not contain a statutory right to cast a vote as a member of the BOS. As such, the defendants' motion to dismiss Count II of Hooker's amended complaint—alleging a category one *Bowman* claim for wrongful termination—will be granted and dismissed.

## IV.  CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss for failure to state a claim (Dkt. No. 20) with be granted in part and denied in part. The motion will be granted as to Count II, the *Bowman* wrongful termination claim, and all official-capacity claims alleged against the defendants. The motion will be denied as to Hooker's individual-capacity First Amendment retaliation claims against the defendants under 42 U.S.C. § 1983. An appropriate order will follow.

Entered: September 30, 2024.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
Chief United States District Judge